# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

| | |
|---|---|
| **KIMBERLY COHELEY,** | ) |
| | ) |
| **Claimant,** | ) |
| | ) |
| vs. | ) Case No. 4:15-cv-782-CLS |
| | ) |
| **CAROLYN W. COLVIN, Acting Commissioner, Social Security Administration,** | ) ) ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION AND ORDER

Claimant, Kimberley Coheley, commenced this action on May 8, 2015, pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner, affirming the decision of the Administrative Law Judge ("ALJ"), and thereby denying her claim for a period of disability, disability insurance, and supplemental security income benefits.

The court's role in reviewing claims brought under the Social Security Act is a narrow one. The scope of review is limited to determining whether there is substantial evidence in the record as a whole to support the findings of the Commissioner, and whether correct legal standards were applied. *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983).

Claimant contends that the Commissioner's decision is neither supported by substantial evidence nor in accordance with applicable legal standards. Specifically, claimant asserts that the ALJ improperly considered the opinions of the treating and examining physicians and failed to consider all of her severe impairments.[1] Upon review of the record, the court concludes that these contentions are without merit, and the Commissioner's decision should be affirmed.

**A.     Medical Opinions**

The opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004) (internal citations omitted). Good cause exists when "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) [the] evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Id*. (alterations supplied). Additionally, the ALJ is not required to accept a conclusory statement from a medical source, even a treating source, that a claimant is unable to work, because the decision on that issue is not a medical question, but is a decision "reserved to the Commissioner." 20 C.F.R. §§ 404.1527(d) & 416.927(d).

---

[1] Claimant previously asserted that the ALJ failed to state adequate reasons for finding her not credible, that she met Listings 12.04 and 12.06, that the ALJ's hypothetical question to the vocational expert did not include all of her impairments, and that the ALJ's residual functional capacity finding was not supported by substantial evidence. Claimant withdrew those arguments in her supplemental brief. Doc. no. 20, at 20.

Social Security regulations also provide that, in considering what weight to give *any* medical opinion (regardless of whether it is from a treating or non-treating physician), the Commissioner should evaluate: the extent of the examining or treating relationship between the doctor and patient; whether the doctor's opinion can be supported by medical signs and laboratory findings; whether the opinion is consistent with the record as a whole; the doctor's specialization; and other factors. *See* 20 C.F.R. §§ 404.1527(c) & 416.927(c). *See also Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986) ("The weight afforded a physician's conclusory statements depends upon the extent to which they are supported by clinical or laboratory findings and are consistent with other evidence as to claimant's impairments.").

Finally, Social Security regulations provide that the opinions of state agency physicians are entitled to substantial consideration. *See* 20 C.F.R. §§ 404.1527(e)(2)(i) & 416.927(e)(2)(i) (stating that, while the ALJ is not bound by the findings of a State Agency physician, the ALJ should consider such a reviewing physician to be both "highly qualified" and an "expert" in Social Security disability evaluation). *See also Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981) ("The Secretary was justified in accepting the opinion of Dr. Gordon, a qualified reviewing physician, that was supported by the evidence, and in rejecting the

conclusory statement of Dr. Harris, a treating physician, that was contrary to the evidence."); *Surber v. Commissioner of Social Security Administration*, No. 3:11–cv–1235–J–MCR, 2013 WL 806325, *5 (M.D. Fla. March 5, 2013) (slip copy) ("State agency medical consultants are non-examining sources who are highly qualified physicians and experts in Social Security disability evaluation, and their opinions may be entitled to great weight if supported by evidence in the record.").

### 1.  Dr. Grant

Dr. Richard Grant, claimant's treating physician at CED Mental Health Services, completed a "Mental Health Source Statement" on August 5, 2011. He indicated that claimant would experience extreme limitation of her abilities to understand and remember detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. She would experience marked limitation of her abilities to understand and remember very short and simple instructions; carry out detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination or proximity to others without being distracted by them; accept

instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. She would experience moderate limitation of her abilities to remember locations and work-like procedures, carry out very short and simple instructions, sustain an ordinary routine without special supervision, make simple work-related decisions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. She would experience only mild limitation of her abilities to interact appropriately with the general public, ask simple questions or request assistance, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, and be aware of normal hazards and take appropriate precautions.[2]

The ALJ afforded Dr. Grant's opinion no weight, stating:

> The claimant presented to CED on March 11, 2011; May 10, 2011; July 22, 2011; and August 3, 2011. During those visits, the claimant's global assessment of functioning increased from 59 to 60 to 62. The claimant was observed to be stable and to have level, appropriate mood . . . . Such reports are simply inconsistent with the medical source statement of August 5, 2011, that showed marked and extreme limitations. The statement is inconsistent with [Dr. Grant's] own treating records.[3]

The court finds that the ALJ adequately articulated his reasons for rejecting Dr. Grant's assessment, and that the ALJ's decision was in accordance with applicable law. *See Phillips*, 357 F.3d at 1241 (stating that the ALJ should consider whether the

---

[2] Tr. 508-09.

[3] Tr. 29 (alteration supplied, record citations omitted).

"treating physician's opinion was . . . inconsistent with the doctor's own medical records"). The decision also was supported by substantial evidence of record. Dr. Grant's records from 2011 reflect that, while claimant suffered from bipolar disorder, her symptoms were not as severe as suggested by Dr. Grant's Mental Health Source Statement. On March 11, 2011, claimant displayed appropriate appearance, dysphoric mood, normal affect, and full orientation, and she was assigned a GAF score of 59, placing her at the high end of the range for moderate symptoms.[4] On April 8, 2011, claimant displayed appropriate appearance, expansive mood, and full orientation, and her GAF score had increased to 60, indicating only mild symptoms.[5] On May 10, 2011, claimant displayed appropriate appearance, elevated mood, normal affect, and full orientation, and her GAF score again was 60.[6] On July 22, 2011, claimant displayed clean dress, normal speech, euthymic mood, appropriate affect, "ok" thought content, and coherent thought processes.[7] She was not assigned a GAF score on that date. On August 3, 2011, claimant displayed appropriate appearance, appropriate mood, normal affect, and full orientation, and her GAF score had increased to 62, again indicating only mild symptoms.[8]

---

[4] Tr. 500.
[5] Tr. 507.
[6] Tr. 506.
[7] Tr. 505.
[8] Tr. 501, 504.

Claimant cannot rest on her diagnosis of bipolar disorder alone, when her medical records indicate that she experienced only mild to moderate symptoms, and her condition was steadily improving with treatment. *See* 20 C.F.R. §§ 404.1505(a) & 416.905(a) (defining a disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months"). *See also Bowen v. Yuckert,* 482 U.S. 137, 146 (1987) ("The [Social Security] Act 'defines "disability" in terms of the effect a physical or mental impairment has on a person's ability to function in the workplace.'") (quoting *Heckler v. Campbell,* 461 U.S. 458, 459-60 (1983)).

Claimant also asserts that the ALJ's rejection of Dr. Grant's opinion was "based on the false premise that claimant's symptoms are always the same, [when] Claimant suffers from a bipolar disorder which is characterized by extreme mood swings."[9] The record does not support that argument. To the contrary, the ALJ took into account claimant's mood swings and other fluctuating symptoms, and he nonetheless concluded that claimant's overall condition actually had *improved* over time with treatment.

## 2. Dr. Wilson

David R. Wilson, Ph.D., conducted two consultative psychological

---

[9] Doc. no. 10 (claimant's brief), at 18 (alteration supplied).

examinations on claimant. The first exam occurred on March 5, 2008, in conjunction with claimant's previous application for disability benefits. Claimant reported to Dr. Wilson that she had been hospitalized for thirteen days during May of the previous year for an accidental overdose of prescription medication, and she had been diagnosed with bipolar disorder in August of the previous year. She had never done any illegal drugs or smoked cigarettes, and she drank alcohol "'occasionally — once every two or three months.'"[10] Claimant's thought processes were intact, her speech was clear and normal, and she was not hyperactive or overly restless. Claimant denied any hallucinations, delusions, phobias, obsessions, or compulsions. She reported sometimes feeling panicked when she was exposed to crowds. Her affect was within normal limits and appropriate to the situation. She reported severe mood swings, including some periods of intense hyperactivity and insomnia. On an everyday basis, claimant reported sleeping only 3-4 hours a night. Her appetite and energy were variable, and her insight and judgment were fair. She denied any suicidal thoughts. Claimant reported spending her time reading, watching television, cross-stitching, knitting, and using her computer. She did not have the energy for exercise, but she did attend church two to three times a month. Her intelligence was estimated to be in the low average range, and she exhibited some mild problems with short term memory. Psychological testing was

---

[10] Tr. 416.

**indicative of significant distress and disturbance.** She has a lot of somatic complaints and concerns. She is extremely depressed and this may be to such a degree that she is not able to function at times. She has a lot of anger and frustration and she may have a hard time expressing this in adaptive ways. She is suspicious and she has a hard time trusting others. She is very anxious and she may tend to worry and obsess a lot. She has some unusual thoughts, and her thinking may break down under pressure — there are indications of a possible thought disorder.[11]

Dr. Wilson's assessment summary was that claimant

has been diagnosed with bipolar disorder and she is on medication, but she does not appear to be responding that well yet. She has shown some improvement, but she does still have severe mood swings and rapid thoughts, as well as severe problems sleeping. She also struggles with panic attacks. She also has migraines which apparently can be triggers [*sic*] by certain inhalants, such as perfumes. *Her level of disturbance is so severe that it is highly unlikely that she will be able to maintain employment.*[12]

Dr. Wilson assessed claimant with bipolar disorder, migraines, and inadequate access to necessary medical and psychiatric care, and he assigned a GAF score of 48, indicating serious symptoms.[13]

Dr. Wilson's second examination occurred on June 10, 2009, when claimant's attorney suggested that she return to Dr. Wilson "for an update."[14] Claimant informed Dr. Wilson that she was not currently taking any medication for her bipolar disorder, because the medicine she had been prescribed by Dr. Grant and at the Mental Health

---

[11] Tr. 418 (emphasis in original).

[12] Tr. 418-19 (emphasis supplied).

[13] Tr. 419.

[14] Tr. 420.

Center made her feel like a zombie. Since discontinuing her medication, claimant had been experiencing "ups and downs."[15] On the date of the examination, she was in a manic phase. She reported that she had stayed awake for 48 continuous hours earlier in the week, and that she was unable to focus on a singular task. She also had discontinued her counseling at the Mental Health Center because she did not think it was helping her. She had, however, been taking her migraine medication, and it was helping her condition, although she did still get headaches after being exposed to certain odors.

Claimant reported still living at home with her parents. Her daughter was doing well, and she was "kind of sorta" in a romantic relationship with a man she saw about twice a month.[16] She denied any use of alcohol, illegal drugs, cigarettes, or methadone. She claimed to be unable to work because of "'my going into these cycles — being manic for a few days and going into a depressed state — I take to my bed and can't get out for a while and I can't focus on anything."[17] Her daily activities included watching television, reading, sitting on the porch, talking with family, using her computer to play games and communicate through e-mail, and attending church.

Upon examination, claimant was alert, oriented, and appropriately groomed.

---

[15] Tr. 421.
[16] Tr. 422.
[17] Tr. 423.

Her thought processes were intact, but her speech was rapid and she "did seem manic."[18]  She denied hallucinations, delusions, ideas of reference, phobias, obsessions, and compulsions. Her panic attacks had decreased, but she attributed that to staying home more.  Claimant reported mood swings, irritability, manic phases, trouble sleeping, low appetite, variable energy, and crying spells, but she had no suicidal ideation.  She exhibited good mental control, low-average intelligence, and mild problems with short-term memory.  Psychological testing again was

> **indicative of significant distress and disturbance.**  She has serious somatic complaints and concerns.  She is extremely depressed and this may be to such a degree that she is not able to function at times.  Her mood is likely to be a serious problem for her and she may often feel helpless and hopeless.  She also is very angry and frustrated at times, and this may cause her problems.  She may have a hard time expressing this in adaptive ways.  She may also have problems dealing with rules and regulations and those in a position of authority because of this.  She is suspicious and she has a hard time trusting others.  She is very anxious and she may tend to worry and obsess a lot.  She has some unusual thoughts, and her thinking may break down under pressure — there are indications of a possible thought disorder.  She may also have some manic tendencies.[19]

Dr. Wilson's assessment summary was:

> Ms. Coheley continues to present with problems related to bipolar disorder and it is unfortunate that she has not been able to get the medication and treatment that she needs.  She has been on medication, but she has not been able to find the right combination, and her report suggests that at times she has been over-medicated.  She is not on

---

[18] Tr. 424.

[19] Tr. 425 (emphasis in original).

medication now, and she has hardly been sleeping at all, and when she was seen, she was in a manic phase. She does still have severe mood swings and rapid thoughts, as well as severe problems sleeping. She also struggles with panic attacks although these may be less frequent, simply because she does not get out much. She also has migraines which apparently can be triggered by certain inhalants, such as perfumes. *Her overall level of disturbance is so severe that it is highly unlikely that she will be able to maintain employment.* It is also unlikely that her condition or status will improve in the next 12 months.[20]

Dr. Wilson assessed claimant with bipolar disorder, most recent episode manic, migraines, and inadequate access to necessary medical or psychiatric care. Her GAF score remained at 48, continuing to indicate serious symptoms.[21]

The ALJ afforded Dr. Wilson's opinions only little weight, stating that,

while Dr. Wilson did actually examine the claimant, there is no evidence that he had access to the claimant's entire medical record. His opinions appeared to be based solely on two examinations and the claimant's self-report. Dr. Wilson opined that the claimant's "level of disturbance was so severe that it was unlikely that she would be able to maintain employment." This opinion is simply not consistent with the medical record as a whole. Additionally, two years after these opinions were rendered (in May 2011), the claimant spent time as a volunteer at a warehouse helping storm victims while making presentations to CED where she received global assessments of functioning with consistent steady increases over a six-month period from March through August 2011. Therefore, little weight is given to his assessments.[22]

The ALJ's observation that Dr. Wilson did not have access to claimant's medical records appears to be incorrect. As claimant points out, her attorney's

---

[20] Tr. 425 (emphasis supplied).

[21] Tr. 426.

[22] Tr. 29.

12

engagement letter to Dr. Wilson enclosed CED records from January 3, 2002 to January 18, 2008, and Gadsden Psychological Services records from March 5, 2008.[23] Even so, Dr. Wilson would not have had access to claimant's more recent records, particularly those from 2011, because they did not exist at the time of Dr. Wilson's evaluations. As discussed above, the 2011 records indicate that claimant exhibited no more than moderate symptoms, and her condition improved over a treatment period of approximately six months. Accordingly, the ALJ's finding that Dr. Wilson's opinions were inconsistent with the medical record was supported by substantial evidence. That reason alone would have been sufficient to support the ALJ's decision to afford only little weight to Dr. Wilson's opinions, even though the ALJ's observation about Dr. Wilson's access to claimant's medical records was factually incorrect. Moreover, the ALJ did not impermissibly substitute his own opinion for that of Dr. Wilson, as claimant suggests. Instead, he permissibly discounted Dr. Wilson's opinion because he found that it was inconsistent with other, more persuasive, medical evidence. *See* 20 C.F.R. § 404.1527(c) (providing that the ALJ should consider whether any doctor's opinion is consistent with the record as a whole).

### 3.  Dr. Estock

Dr. Robert Estock, the reviewing state agency physician, found on January 16,

---

[23] Doc. no. 14-1 (May 18, 2009 letter from Rose Marie Allenstein to David Wilson PhD).

2011, that there was insufficient evidence to assess the disabling effects of claimant's mental and psychological limitations. His only notes were:

> 37[-year-old female] alleging bipolar disorder, depression, scars on her lungs, migraines, high blood pressure, & insomnia, with an [accidental overdose] of 7/25/09 & [date last insured] 3/31/10. Records show that she sought [mental health center] treatment for Alcohol Dependence & Bipolar [Disorder] in '09 but was lost to [follow-up]. A [medical source evaluation] was scheduled for her on 12/22/10 that she did not attend after agreeing to do so. There is insufficient evidence available of a disability relating to the period before the insured status was last met. Because the claimant did not keep the scheduled appointment, there is also insufficient evidence available to completely assess her current condition.[24]

The ALJ afforded "some weight" to Dr. Estock's evaluation, stating:

> Dr. Estock observed that as of January 2011, there was simply insufficient evidence from which to assess the claimant's condition as to any severe mental impairment. Dr. Estock did not have access to the later evidence that showed some impairment, but consistent progress with treatment in 2011. Therefore, some weight is given to the extent that his assessment was consistent with the records at the time it was rendered.[25]

To the extent claimant is asserting that the ALJ should not have afforded Dr. Estock's notes *any* weight for the sole reason he was a state agency physician who only reviewed claimant's records but did not examine claimant, that argument is not persuasive. As discussed above, an ALJ may rely upon the opinion of a state agency physician if it is reliable and supported by the record. *See* 20 C.F.R. §§

---

[24] Tr. 367 (alterations supplied).
[25] Tr. 30.

404.1527(e)(2)(i) & 416.927(e)(2)(i); *Oldham*, 660 F.2d at 1084; *Surber*, 2013 WL 806325, at *5.  Here, the ALJ only credited Dr. Estock's opinion to the extent it was supported by the medical records available at the time the opinion was rendered. Claimant has not asserted any other arguments about how the ALJ may have improperly considered Dr. Estock's opinion, and this court can discern no error.  In any event, Dr. Estock's opinion appears to have had little effect on the ALJ's decision, because Dr. Estock rendered the opinion in January of 2011, but the ALJ relied primarily upon medical records from later that year to find that claimant was not disabled.

### B.    Severe Impairments

Claimant next asserts that the ALJ failed to consider certain of her impairments as "severe," and failed to consider *all* of her impairments, including those that are not severe, in evaluating her disability.  The ALJ found that claimant had only two severe impairments: affective disorder and migraine headaches.[26]  Claimant asserts that the ALJ also should have classified her depression, bipolar disorder, panic attacks, insomnia, carpal tunnel syndrome, and hypertension as severe impairments.  Social Security regulations define a "severe" impairment as one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c) (alteration supplied).  Claimant failed to explain how any of

---

[26] Tr. 20.

the additional impairments she has identified significantly affected her ability to do basic work activities. In any event, even though the ALJ did not find the additional impairments discussed by claimant to be "severe," he did consider them in evaluating claimant's ability to perform work-related activities.[27] That was in accordance with Social Security regulations, which state the following with regard to the Commissioner's duty in evaluating multiple impairments:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. § 1523. *See also* 20 C.F.R. §§ 404.1545(e), 416.945(e) (stating that, when the claimant has any severe impairment, the ALJ is required to assess the limiting effects of *all* of the claimant's impairments — including those that are not severe — in determining the claimant's residual functional capacity).

---

[27] *See* Tr. 23-30. The sole exception is claimant's carpal tunnel syndrome, which is not discussed in the ALJ's decision. That omission did not constitute error, however, because claimant did not mention that impairment in her application for disability benefits or during the administrative hearing. As the Commissioner points out, an ALJ has no duty to consider an impairment that has not been raised at any point during the administrative process. *See Robinson v. Astrue*, 365 F. App'x 993, 995 (11th Cir. 2010) ("Here, Robinson, who was represented at the hearing before the ALJ, did not allege that she was disabled due to CFS either when she filed her claim or at her May 2006 hearing. Consequently, the ALJ had no duty to consider Robinson's CFS diagnosis.") (citing *Pena v. Chater*, 76 F.3d 906, 909 (8th Cir. 1996)).

Moreover, even if the ALJ erred in failing to classify claimant's depression, bipolar disorder, panic attacks, insomnia, carpal tunnel syndrome, and hypertension as severe impairments, any such error would have been harmless. As the Eleventh Circuit explained in *Medina v. Soc. Sec. Admin.*, 637 F. App'x 490 (11th Cir. 2016):

> Step two of the [five-step process for adjudicating Social Security claims, during which the Commissioner must determine whether the claimant has a severe impairment] merely "acts as a filter" *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987). In other words, "if no severe impairment is shown the claim is denied, but the finding of any severe impairment, whether or not it qualifies as a disability and whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough" to proceed with the rest of the five-step analysis. *Id*. Thus, even if [the claimant's] other conditions should have been categorized as severe impairments, any error was harmless because the ALJ determined that her obesity and "thyroid cancer status post total thyroidectomy" were severe impairments, allowing him to move onto step three of the test. *See Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (holding that the complained-of error was harmless because it did not impact the step being challenged); *see also* 20 C.F.R. § 404.1520(a)(4).

*Medina*, 2016 WL 66699, at *2 (alterations supplied).

**C.   Conclusion and Order**

Consistent with the foregoing, the court concludes the ALJ's decision was based upon substantial evidence and in accordance with applicable legal standards. Accordingly, the decision of the Commissioner is AFFIRMED. Costs are taxed against claimant. The Clerk is directed to close this file.

DONE this 8th day of September, 2016.

_____
United States District Judge